UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:05CV-832-H

PATRICIA GAIL MILBURN                                                                         PLAINTIFF

V.

THE HARTFORD LIFE AND
ACCIDENT INSURANCE COMPANY                                                      DEFENDANT

**MEMORANDUM OPINION**

  Plaintiff, Patricia Gail Milburn, appeals the denial of long-term disability benefits under an Employee Retirement Income Security Act ("ERISA") plan administered by Defendant, The Hartford Life and Accident Insurance Company ("Hartford"). In many respects, this case is not unusual. The disability policy language is standard. Hartford granted Ms. Milburn short-term disability for twenty-four months because she could not perform her regular occupation. At the conclusion of that time, Hartford reevaluated Ms. Milburn and determined that she was able to perform some work and, therefore, terminated her benefits. Ms. Milburn perfected this appeal and has now moved for summary judgment.

I.

  The issue before the Court is whether or not Hartford's decision to deny long-term disability benefits was arbitrary and capricious. *See Firestone Tire and Rubber Company v. Bruch*, 489 U.S. 101, 115 (1989) (holding that when the benefit plan gives the administrator discretionary authority to determine eligibility for benefits, the denial of benefits is reviewed

using an arbitrary and capricious standard). Under this standard, it is often the case that the administrator's decision to deny long-term benefits is sustained after a reasonable evaluation. Liability in this case is to be determined based on the administrative record alone, without consideration of other evidence. *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 615 (6th Cir. 1998).

Hartford provides long term disability benefits for employees of Norton Healthcare. Under the terms of Hartford's policy, an employee is considered disabled if she cannot perform her own occupation for the first twenty-four months after the initial grant of long-term disability benefits. To continue to receive such benefits after that period, the applicant must be unable to perform any occupation for which the claimant is qualified by education, training or experience.

Since October 19, 2001, Plaintiff has been unable to perform her work as a medical assistant at Norton Healthcare. Among other things, Ms. Milburn was found disabled from her job due to right shoulder problems requiring surgery, knee pain and back pain. Her knee problems were severe enough to require a knee replacement surgery. Her primary care physician, Dr. Norman Lewis, indicated that she could perform no job requiring standing, walking, climbing and could only do sedentary employment. He also said that she could never return to work. Plaintiff received a total disability determination from the Social Security Administration.

Thus, in 2004 at the conclusion of Plaintiff's initial twenty-four month disability period, Hartford was faced with a 54-year-old woman with many impairments. Nevertheless, they began to build a case for denying long-term benefits. On March 18 and 19, 2004, Ms. Milburn underwent a functional capacities evaluation ("FCE") for Hartford. Her examination revealed in

part that the diagnoses on the physical therapist's report indicated that Ms. Milburn had a left total knee replacement, right should separation, spondylosis, scoliosis, irritable bowel syndrome, osteoporosis, degenerative disc disease, reflux, hyperlidemia, anxiety, depression and fibromyalgia.

The examiner noted that she gave maximum consistent effort in completing the evaluation. He also determined that she could sit for only one-half hour at a time for a total of three hours per day; that she could stand for only one-half hour at a time for a total of two hours a day; that she could walk for only one-half hour at a time for one hour a day, and that she could drive only one-half hour at a time for two hours a day. The examiner also found that she could never climb, stoop, kneel, crouch, crawl, or reach above her shoulder. She could only occasionally reach below her waist level. Amazingly, Hartford was able to conclude that Ms. Milburn was capable of working. To do this, the Court concludes, was possible only due to the absence of fairness, the abuse of discretion and through the use of a one-sided evaluation process.

II.

The Court has carefully reviewed the entire file and finds the following examples of conduct, which taken together, demonstrates and supports the Court's conclusions:

1. The FCE specifically states that Ms. Milburn can only return to work, with the restrictions listed in the FCE, "when released by her MD [sic]." (MIL 00430) Nowhere in the record is there any release to return to work by a physician of Ms. Milburn. On the contrary, letters from her attending physicians written before and after the FCE indicate continued disability and give no release to return to work. An August 10, 2004 letter from Dr. Olash, who

3

had been her physician "for several years", summarizes her condition when she appeared before him and the diagnoses made by her other doctors. (MIL 00224) Specifically, he notes that Ms. Milburn told him that she cannot stand for prolonged periods or sit in one position for over thirty minutes. He also explains that Dr. Lewis diagnosed Ms. Milburn with severe end-stage patellofemoral arthritis in both knees, a diagnosis supported by a March 19, 2002 letter from Dr. Lewis in which he strongly recommends that she receive disability and states that "gainful employment will be very limited in the future." (MIL 00225) Dr. Olash also points to the diagnosis of fibromyalgia, which is supported by a July 30, 2004 letter from Dr. Gleason. (MIL 00226) Both Dr. Olash and Dr. Gleason note that she had also been diagnosed with ulcerative colitis by her gastroenterologist, Dr. Kraft. The condition limits treatment of her other ailments. (MIL 00226) The letters from Dr. Gleason, Olash, and Lewis are anything but releases to return to work.

    2.      The FCE is internally inconsistent. "Balance" is listed as an environmental restriction even though a previous page of the FCE states that Ms. Milburn can perform balancing "frequently". (MIL 00430) No explanation accompanies the restriction.

    3.      Hartford's adjustments of Ms. Milburn's Ability Profile used to generate her Employability Analysis Report ("EAR") is almost beyond comprehension. According to the Adjusted Variables Summary (MIL 00404), at least four categories were changed in direct contradiction with the Functional Capacities Evaluation ("FCE"), and there is no basis in the record to support the changes. Climbing, stooping, reaching, and handling were all adjusted above levels recorded in the FCE. Climbing was changed to "frequently", even though the FCE restricts Ms. Milburn to "never" and specifically lists it as an environmental restriction. (MIL

00429) Likewise, the FCE restricts stooping to "never", but it was changed to "constantly" in the EAR. (MIL 00429) Reaching and Handling were both changed to "constantly" as well, even though there is no support for that in the FCE. (MIL 00430)

  4. Many other categories on Ms. Milburn's Ability Profile were changed even without any apparent basis in the FCE or anywhere in the administrative record for the changes. For example, the physical demands categories dealing with sensory perception (*e.g.*, "hearing", "tasting/smelling", "near acuity", "far acuity", etc.) and all of the environmental conditions (*e.g.*, "exposure to weather", "extreme cold", "extreme heat", "wet and/or humid", etc.) in her Ability Profile were changed to "constantly", though there is no support for such changes in the record. (MIL 00404)

  5. Apparently, Hartford's conclusions are based upon the assumption that Plaintiff could perform full-time sedentary employment. However, it is difficult to comprehend how someone capable of sitting only one-half hour at a time for only three hours a day could possibly qualify for such employment. Moreover, despite the sitting restriction, the FCE states that she is also able to drive for an additional two hours a day. Although it would seem that sitting time and driving time should run concurrently, the hours are added, along with standing and walking time, to reach a conclusion that Ms. Milburn can work an eight-hour day.

  6. Hartford asked doctors to evaluate the FCE and make occupational assessments, which they reasonably refused to do.[1] Hartford mailed the results of the FCE to Dr. Lewis and asked for his comment. When he refused to provide an opinion as to the FCE, Hartford

---

[1] Physicians are reasonably capable of making certain functional assessments, but not necessarily occupational ones.

5

concluded that its results were valid.[2] Hartford assumes that because doctors will not respond to their requests, that the doctors must agree with whatever reports have been enclosed. This is an improper assumption which cannot be justified.

In summary, Hartford's decision to deny benefits was based upon EAR results stemming from inputs that were consistent with neither the FCE performed by a physical therapist nor recommendations and evaluations of physicians. No doctor opined that Ms. Milburn could return to work, and there was substantial evidence to indicate that she could not. These are just a few of the examples of how Hartford presented itself with a record and a conclusion that bears little resemblance to Ms. Milburn's actual circumstances.

### III.

The above referenced factual findings are sufficient to support an arbitrary and capricious finding. In view of these findings combined, several other factors further support reversal.

The denial of benefits on this record is particularly troubling in light of Hartford's position as both the administrator and the entity paying the benefits. *See Killian v. Healthsource Provident Adm'rs, Inc.*, 152 F.3d 514, 521 (6th Cir. 1998) (holding that an actual conflict of interest arises when an insurer acts as both administrator charged with interpreting a plan and its issuer who ultimately pays for the plan's expenses). Where the decision to deny benefits seems

---

[2] In Hartford's Summary Detail Report, Karen M. Whitmore, a nurse in Minneapolis engaged in Occupational Analysis, records a response from Dr. Lewis on May 31, 2004, in which he declines to comment on the FCE report supplied to his office:

> Please be advised that I do not provide opinions on patients' permanent limitations and/or work restrictions outside of a regular scheduled medical evaluation. If not provided by me within a regular scheduled visit, this information should be requested from the primary care physician or an independent medical examiner. The patient may want to task his insurance company to send him/her for an independent medical exam. (Physicians of this office do not perform these exams.) I also do not determine causation of the condition, i.e. whether or not it is work-related, accident-related, etc., if not stated within my office notes. I will provide co[pies [sic] of recoreds [sic] to authorized entities regarding disability following HIPAA guidelines. (MIL 00150)

contrived or inconsistent with the whole record, the existence of a conflict of interest should be considered as a factor in the abuse of discretion equation. *Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006). Here, it suggests a reason and motive for a process which appears driven to achieve a particular result.

Another factor which Hartford should have given some consideration was its knowledge that Plaintiff had received total disability from the Social Security Administration. In our circumstances, the Social Security determination adds weight and credibility to the existing evidence. To ignore it and its potential relevance, further supports the conclusion that Hartford's decision process was arbitrary and pre-ordained.

Finally, where so much evidence supports disability, Hartford's decision to deny benefits without the benefit of an independent medical examination also suggests a pre-ordained and arbitrary process. *Glenn v. Metlife*, 461 F.3d at 671. Instead of seeking an independent examination, Hartford appears to draw unwarranted conclusions from the existing medical record and to suggest conclusions from the absence of comment. These actions and inactions support the conclusion that the evaluation process was arbitrary and virtually pre-ordained.

The Court will enter an order consistent with this Memorandum Opinion.

cc: Counsel of Record